UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------
)
JULIO MONTANO, Plaintiff, )
)
v. )
)
C. ENWEREUZOR, Correction )
Officer, in his individual )
capacity, Defendant. )
)
--------------------------------

**COMPLAINT**
Bivens Action
Jury Trial Demanded

Civ. Action No. _____

PRO SE

## INTRODUCTION

1.   This is a civil rights action filed by JULIO MONTANO, a federal prisoner, for damages for physical and emotional injuries sustained as a result of an excessive use of force by defendant C. ENWEREUZOR, a Correction Officer employed at the Metropolitan Correctional Center in Manhattan ("MCC"). This action is brought pursuant to <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971) and New York State common law.

## JURISDICTION

2.   This Court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. § 1331 and 1343 and has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## PARTIES

3.   At the time of the incidents complained of, Plaintiff JULIO MONTANO was incarcerated at MCC.

4.   At the time of the incidents complained of, Defendant C. ENWEREUZOR, whose full name is presently unknown to Plaintiff, was a Correction Officer employed at MCC. He is sued in his individual capacity.

5.   At all times complained of, Defendant was acting under color of federal law.

## FACTS

6. At the time of the incidents complained of, Plaintiff was 62 years old, was approximately 5 feet 11 inches in height, and weighed approximately 145 pounds.

7. Plaintiff then suffered and continues to suffer from type II diabetes, hypertension, progressive polyneuropathy, multiple subcutaneous cysts in his feet, and general frailty as a result of his advanced age.

8. Additionally, Plaintiff had surgery in February, 2013 to remove an abscess from the area of his right hip.

9. As a result of Plaintiff's advanced age and medical problems, he had a limited range of active and passive motion and suffered from continuous pain in his hips and lower extremeties.

10. As a further result of Plaintiff's advanced age and medical problems, the Bureau of Prisons ("BOP") had issued him a cane, a "bottom bunk pass" to ensure that while incarcerated he would not have to climb or risk injuries from falls off a top bunk, and prescriptions for Insulin, Lisonipril, metFORMIN, and Nortriptyline.

11. On December 23, 2013 Plaintiff was housed on unit 5 South at MCC and Defendant was working that unit.

12. At 3:00PM on December 23, 2013, Plaintiff had to report to MCC's medical department for a callout.

13. The medical department at MCC is located on the 2nd floor, and 5 South is located on the 5th floor.

14. Inmates at MCC cannot freely move between floors. When an inmate needs to travel from one floor to another, movement is by elevator or, in emergencies, by stairwell.

15. For inmates housed on units 5 South and 5 North, access to the inmate

2

elevator is via a common area between 5 South and 5 North. Access to the common area is through the housing unit exit/entry door, which must be unlocked by staff. A rough diagram of this layout is attached as <u>Exhibit 1</u>.

16. When inmates are in the common area, they cannot access or operate the elevator. The elevator is operated by one or more officers designated "Internal" who ride the elevator with inmates between floors.

17. When an inmate needs to travel between floors, the sending area officer will ordinarily contact Internal by radio or telephone for a move. Internal will then bring the elevator to the sending area, pick up the inmate or inmates, travel with them in the elevator, and drop them off at the receiving area.

18. In the case of a move from 5 North or 5 South to the medical department, the housing unit officer will ordinarily contact Internal and request a move, unlock the housing unit exit door, pat frisk the inmate as he exits the housing unit into the common area, wait in the common area with the inmate until Internal arrives and picks up the inmate, then re-enter and lock the housing unit door.

19. Sometimes, the housing unit officer will frisk the inmate, allow him into the common area to wait, and immediately re-enter and lock the housing unit door without waiting for Internal. In that case, the inmate waits in the common area as normal; the only difference is that the housing unit officer does not wait in the common area also.

20. Occasionally, it will take a few minutes for Internal to arrive at the sending area, or a sending area officer will have to contact Internal more than one time, because of a move already in progress.

21. When an inmate returns to 5 North or 5 South, Internal will sometimes notify the housing unit officer that an inmate is returning. If Internal does not, or if the housing unit officer is not at the door when the inmate exits

the elevator into the common area, the inmate rings the housing unit doorbell
to alert the housing unit officer to a returning inmate and to unlock the door.

22. On December 23, 2013 when it was time for Plaintiff to report to the
medical department, Defendant contacted Internal, pat frisked Plaintiff (and
another inmate who also had an appointment), allowed him into the common area
to wait, and immediately re-entered the housing unit and locked the housing
unit door.

23. After about 15 minutes, Internal still had not arrived and it was becoming
difficult and painful for Plaintiff to continue standing, so he rang the
doorbell with the intention of notifying Defendant that Internal had still not
arrived.

24. Defendant came to the door but did not exit the housing unit.  Plaintiff
told Defendant, who could see Plaintiff through the housing unit door's window
and hear what was being said, that Internal had still not arrived.

25. Defendant responded by yelling at Plaintiff through the door to not ring
the doorbell or he would send Plaintiff to the 9th floor, the "hole" (solitary
confinement).

26. Plaintiff explained that he had rang the doorbell because he had been
waiting for 15 minutes for Internal.

27. There is no rule prohibiting inmates from ringing the doorbell to alert a
housing unit officer to this type of situation, but Plaintiff did not ring the
doorbell again.

28. At about the same time, Internal arrived.  There were two officers working
the elevator.

29. Plaintiff turned around and walked toward the elevator, and Defendant
opened the housing unit door and entered the common area behind him.

30. As Plaintiff walked toward and into the open elevator, one of the officers

4

asked Plaintiff where he was going, and Plaintiff responded that he was going to the medical department.

31. As Plaintiff stepped into the elevator, Defendant yelled at the elevator officers that Plaintiff was not going to medical, he was going to the hole.

32. Then, without any kind of warning or provocation, Defendant grabbed Plaintiff's shoulder from behind, yanked backwards, and threw him to the floor on his back across the common area in front of the elevator.

33. Defendant's throw and the resulting impact caused Plaintiff severe pain in his lower back and hip where he had had surgery.

34. Defendant ordered Plaintiff to get up, but he could not because of the pain, and told Defendant he could not get up.

35. Immediately recognizing that Defendant's use of force was completely unjustified and may have caused serious injury, the elevator officers rushed to Plaintiff to help him up.

36. When the elevator officers tried to help Plaintiff up, Defendant yelled at them to not help because, according to Defendant, Plaintiff was going to "the hole."

37. The two elevator officers reluctantly left with the other inmate who was going to the medical department.

38. Rather than help him up, Defendant left Plaintiff lying on the floor in the common area in severe pain, went back into the 5 South housing unit, and locked the door.

39. A few minutes later, the two elevator officers returned. Shocked that Defendant had left Plaintiff on the floor, they immediately helped him up and told him they were taking him to the medical department and to not worry about what Defendant had said, that they were going to take care of Plaintiff.

40. Plaintiff was then taken to the medical department and explained what had

5

happened.

41.  Plaintiff was then taken to meet with two on-duty lieutenants, where he again explained what had happened.  The lieutenants told Plaintiff to go back to 5 South and they would handle the situation.

42.  One of the elevator officers escorted Plaintiff back to 5 South, but when Plaintiff arrived, Defendant would not unlock the door.  In order for Plaintiff to get back into 5 South, the elevator officer had to contact a lieutenant, who ordered Defendant to unlock the door.

43.  The next day, Plaintiff was called to the medical department to fill out a formal injury report, where he again recounted the incident.

44.  Plaintiff did not at any time violate any rules, and as far as Plaintiff knows Defendant never even attempted to accuse Plaintiff of violating any rules, nor did Defendant fill out a Use of Force incident report as required.

45.  There was no justification for any use of force at all against Plaintiff, let alone the type and degree of force Defendant used.  By using force and in the manner and degree he used force, Defendant violated 28 C.F.R. Part 552, Subpart C, and BOP Program Statement 5566.06, which regulate use of force by BOP employees.

46.  Further, it is a matter of common sense that throwing a frail and elderly person to the floor on their back creates an obvious risk of serious physical injury or death.  Defendant was aware of but deliberately indifferent to this risk when he threw Plaintiff to the floor.

47.  Since the incident Plaintiff has continuously suffered from severe pain in his lower back, hip, and leg which he did not suffer from before the incident. Walking up and down stairs now causes sharp shooting pains, making it much more difficult for plaintiff to move about.

48.   Plaintiff did not complete the ordinary process of exhausting administrative remedies in the BOP, which consists of attempting to informally resolve an issue, then filing a BP-9, BP-10, and BP-11 form and waiting for a response or constructive denial at each level of review, pursuant to 28 C.F.R. Part 542, but did fully exhaust all "available" administrative remedies with respect to the claims in this complaint against Defendant.  Plaintiff was unable to complete the ordinary exhaustion process because MCC staff erroneously interpreted BOP regulations and refused to provide the necessary forms.

49.   Specifically, Plaintiff requested a BP-8 (Informal Resolution) form and a BP-9 (formal Request for Administrative Remedy) form on January 9, 2014 to start the administrative remedy process, which was within 20 calendar days of the incident as required by 28 C.F.R. § 542.14.  Plaintiff's Unit Manager provided a BP-8 but refused to provide a BP-9, insisting that MCC needed 14 days to respond to a BP-8 before a BP-9 could be provided to an inmate.

50.   Plaintiff filed the BP-8 on January 10, 2014.  See Exhibit 2.

51.   Also on January 10, 2014, Plaintiff requested a BP-9 from his Correction Counselor, who also said that a BP-9 could not be provided until a response was made to the BP-8 and refused to provide a BP-9.

52.   On January 24, 2014 Plaintiff asked his Unit Manager what the status of the BP-8 he filed was, but he was told there was still no response and the Unit Manager still refused to provide a BP-9.

53.   Plaintiff then used the intra-facility email system to contact the MCC Administrative Remedy Coordinator.  Plaintiff explained that both the Unit Manager's and Correction Counselor's actions were inconsistent with 28 C.F.R. § 542.14 and BOP Program Statement 1330.18 § 8(b).  Plaintiff further stated, citing Brownell v. Krom, 446 F.3d 305, 312 (2d Cir. 2005), Dennis v.

Westchester Co., 485 Fed. Appx. 478, 480 (2d Cir. 2012), and Ruggiero v. Co. of Orange, 467 F.3d 170, 175 (2d Cir. 2006), that if Plaintiff did not receive a BP-9 by January 28, 2014 he would have to consider administrative remedies unavailable and proceed directly to court. A copy of this email is attached as Exhibit 3.

54. As of the date of this Complaint Plaintiff has received neither a response to his BP-8, a response to his January 24, 2014 email, or a BP-9 form.

55. Thus, Plaintiff has exhausted all "available" administrative remedies with respect to the claims made against Defendant.


## CLAIMS FOR RELIEF

56. Defendant's actions of using force against Plaintiff without need or provocation were done maliciously, sadistically, and with deliberate indifference to a risk of serious physical injury, and therefore constituted cruel and unusual punishment in violation of the 8th Amendment to the United States Constitution.

57. Defendant's actions of using force against Plaintiff without need or provocation constituted the torts of assault and battery under the laws of the State of New York.


## RELIEF REQUESTED

WHEREFORE, Plaintiff requests that this Court grant the following relief:

A. Compensatory damages against Defendant for the physical and emotional injuries sustained as a result of his unconstitutional and unlawful use of force against Plaintiff;

B. Punitive damages against Defendant;

C. Such other and further relief as this Court deems Plaintiff entitled to.

Respectfully submitted,

Date: 02-13-2014

JULIO MONTANO
Plaintiff, Pro Se
Register No. 39862-069
Metropolitan Corr. Center
150 Park Row
New York, NY 10007

## VERIFICATION

I, JULIO MONTANO, hereby declare under penalty of perjury that I am the
Plaintiff in the above-entitled civil action, that I have read the foregoing
complaint and know the contents thereof, and that the same is true, correct
and complete, except as to matters alleged upon information and belief and as
to such matters I believe them to be true.

Executed on 02-13, 2014 at New York, NY.

JULIO MONTANO

EXHIBIT 1



5 North

5 South

Inmate Elevator

Staff Elevator

Common Area

Doorbell

EXHIBIT 2

## METROPOLITAN CORRECTIONAL CENTER, NEW YORK
## ADMINISTRATIVE REMEDY PROCEDURE FOR INMATES

### INFORMAL RESOLUTION FORM (BP-8)

NOTE TO INMATE: With the exception of sensitive issues and DHO appeals, you are advised that prior to receiving and filing a Request for Administrative Remedy Form BP-229(13) (old BP-9), you MUST attempt to informally resolve your complaint through your correctional counselor. Additionally, in accordance with P.S. 1330.13, you have the responsibility to present complaints in good faith and in an honest and straightforward manner. Before completing this form, you should make every effort to honestly attempt to informally resolve this matter verbally with staff. Briefly state ONE complaint below and list what efforts you have made to resolve your complaint informally.

Date form issued and initials of Corr. Counselor:_____

INMATE'S COMMENTS:

1. Complaint: On Dec 23rd 2013 at around 3:00 PM I had a call out to the Medical office. Officer Enwezor was working on 5 south let out me and Scalbough in the hall way waiting for the elevator. After 15 minutes waiting, I rang the bell. Officer Enwezor told me not to ring the bell. I tried to explain him that we were waiting for so long.

2. Efforts made by you to informally resolve: Officer Enwezor that he will take me to the Hole. I told him that I have done nothing wrong. the elevator came, and when I tried get in to the elevator, Officer Enwezor grabbed me

3. Names of staff you contacted/Date you contacted the staff: by my shoulder and Yanked me out to the floor. I suffered an injury in my back. I was interviewed by the two lieutenants in charge.

Date returned to Correctional Counselor:_____

Inmate's Name  Julio Montano   Register Number 39862-069   Date 01-10-14

CORRECTIONAL COUNSELOR'S COMMENTS:

1. Efforts made to informally resolve and staff contacted:_____
_____
_____

Date informally resolved:_____   Counselor Signature:_____

Date BP-229(13) Issued:_____

Unit Manager:_____

I told the two Leutenants in charge what Happened. after spoke with two Leutenants, they told me to go back to my Unit.

before I went to the medical office, the two Officer who were at the elevator, they took Mr. Scarbough to the medical office, then they came back and picked me up from the floor, and took me to the medical office. December 24th, 2013 around 3:40 P.M. An officer was in my cell telling me that I Have to go to the Medical office to fill out an injury report. Since that day I am suffering terrible pain in my back. Right now I can not move fast.

Last February I Had a surgery in my right leg close by my Hip, and now I'm feeling all my body in pain. Since that incident my back and my leg have been in serious pain and Hurt when I walk up and downstairs.

There was no justification for using the force that Officer Freazor used against me. He Violated my rights under the 8th Amendment, and also Violated 28 C.F.R. Part 552, Subpart C and BOP Program statement 5566.06.

also I would like to receive money for my pain and suffering that he caused. maybe in the future He does not Have to use force against inmates, so nobody else gets Hurt by Him.



01-10-14

I spoke to staff and filed the injury report,
explained in the Complaint.
The names of the officers and medical staff
are in BOP files and my medical records
as explained in the Complaint.

Sincerely

Julio C. Montano

39862-069

EXHIBIT 3

--------------------------------------------------------------------------------------------------

FROM: 39862069
TO: Warden
SUBJECT: ***Request to Staff*** MONTANO, JULIO, Reg# 39862069, NYM-E-S
DATE: 01/24/2014 03:21:38 PM

To: Administrative Remedy Coordinator
Inmate Work Assignment: n/a

To: Administrative Remedy Coordinator, MCC-NY

On January 9, 2014 I asked Unit Manager Byrd for a BP-8 and a BP-9 form so I could start the Administrative Remedy Process about Officer Enweazor (spelling?) using excessive force against me on December 23, 2014. Mr. Byrd gave me a BP-8, which I filed that day, but would not give me a BP-9. He said that they need 14 days to respond to a BP-8 before I can receive a BP-9. The next day I asked Counselor Walkes for a BP-9, and he said I cannot receive one until I get a response to the BP-8, but said nothing about 14 days. Instead, he said I have 20 days from the BP-8 response to file a BP-9.

Both Mr. Byrd and Counselor Walkes were wrong. 28 C.F.R. sec. 542.14 is clear that "The deadline for completion of informal resolution and submission of a formal Administrative Remedy Request, on the appropriate form (BP-9), is 20 calendar days following the date on which the basis for the Request occurred." Also, Program Statement 1330.18 sec. 8(b) is clear that even if a staff member believes an inmate has not attempted or completed informal resolution, they are to provide a BP-9 upon request.

Today, I spoke to Mr. Byrd again (14 days after I submitted the BP-8) and he said there is no response. Therefore, I am requesting that you provide me a BP-9 to submit immediately as the time for informal resolution has expired but staff are refusing to provide one. If I do not receive the appropriate form by January 28, 2014 I will have to consider administrative remedies unavailable and proceed directly to court. See Brownell v. Krom, 446 F.3d 305, 312 (2d Cir. 2005)(prisoner's reliance on erroneous interpretation of regulations by prison officials constitutes "special circumstances" excusing failure to formally exhaust); Dennis v. Westchester County, 485 Fed. Appx. 478, 480 (2d Cir. 2012)(prison officials' refusal to give prisoner the necessary forms excuses failure to exhaust (citing Ruggiero v. Co. of Orange, 467 F.3d 170, 175 (2d Cir. 2006))).

Thank you.